IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| JEREMY LEON HARRIS ) <br> ) <br>     Plaintiff, ) <br> ) <br>   v. ) <br> ) <br> ) <br> CITY CYCLE SALES, INC., ) <br> **SERVE:**    Wayne A. Jaecke ) <br>               1021 Goldenbelt Blvd. ) <br>               Junction City, KS 66441 ) <br> ) <br>     Defendant. ) <br> _____ ) | Case No.: <br><br> **JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Jeremy Leon Harris, for his claims for relief against the Defendant, alleges and states as follows:

### Parties

1. Plaintiff Jeremy Leon Harris (DOB: 11/8/1983) is a married individual and resident and citizen of Stamford, Texas. During the events giving rise to Harris's claims set forth herein, Harris lived with his wife in Junction City, Kansas.

2. Harris was actively enlisted in the United States Army from July 7, 2002 until May 17, 2016, when he was discharged due to being declared "physically unfit to continue military service" by the Army's Physical Evaluation Board based on its determination that injuries he sustained as a direct and proximate result of the motorcycle accident at issue in this case constituted "unfitting conditions."

3. Defendant City Cycle Sales, Inc., ("City Cycle") is a domestic corporation organized and existing under the laws of Kansas, with its principal place of business in Junction

1

City, Kansas. City Cycle may be served via its registered agent for service of process: Wayne A. Jaecke, 1021 Goldenbelt Blvd., Junction City, Kansas 66441.

## Prior State Court Proceedings

4. Plaintiff originally filed this matter in state court on May 19, 2016 in Geary County, Kansas, Case No. 2016-CV-000174 (the "state court action").

5. On January 12, 2021, the state court action was dismissed without prejudice, pursuant to a Joint Stipulation of Dismissal Without Prejudice filed by Harris and City Cycle in the state court action. As part of the Joint Stipulation, the parties agreed that Kansas Administrative Orders related to Covid-19 would not extend the six-month period for re-filing under K.S.A. § 60-518.

## Jurisdiction and Venue

6. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds $75,000.00, exclusive of interest and costs, and involves citizens of different states.

7. City Cycle regularly transacts business in the State of Kansas, including performing "Authorized Service" on Harley-Davidson motorcycles. Further, City Cycle committed tortious acts in Kansas, including but not limited to its negligent servicing of the "V-Rod" motorcycle at issue in this case (the "Subject Motorcycle"), which occurred at City Cycle's authorized Harley-Davidson dealership located at 1021 Goldenbelt Blvd. in Junction City, Geary County, Kansas. City Cycle has therefore submitted itself to the jurisdiction of this Court, pursuant to K.S.A. § 60-308(b).

8. Venue is proper in this Court under 28 U.S.C. § 1391(b).

**Allegations Relating to the Subject Motorcycle**

9. The subject motorcycle is identified as a 2014 Harley-Davidson VRSCDX "V-Rod" motorcycle with Vehicle Identification Number 1HD1HHH15EC802766 ("V-Rod).

10. The V-Rod is equipped with an Anti-Lock Brake System ("ABS") that was included as standard equipment on 2014 Harley-Davidson V-Rod motorcycles.

11. The V-Rod's ABS was designed to prevent the motorcycle's wheels from locking up during brake application.

12. The V-Rod's ABS provides a significant safety benefit to the motorcycle rider because if one or both of a motorcycle's wheels lock up during operation, it can result in a dangerous loss of control.

13. The V-Rod's owner's manual states that Harley-Davidson's ABS "assists the rider in maintaining control when braking in a straight-line emergency situation."

14. The V-Rod's owner's manual also provides that the "ABS operates independently on front and rear brakes to keep the wheels rolling and prevent uncontrolled wheel lock-ups either on dry pavement or on slick surfaces such as gravel, leaves or when riding in wet conditions."

15. The V-Rod's owner's manual provides the following description for how the ABS prevents wheel lock up:

> The ABS monitors sensors at the front and rear wheels to determine wheel speed. If the system detects one or both wheels are slowing down too quickly, which indicates they are close to locking, or if the deceleration rate does not match a criteria stored in memory, the ABS reacts. The system rapidly opens and closes valves to modulate the brake caliper pressure utilizing only the brake lever/pedal pressure being applied by the rider. During ABS activation, the system provides the electronic equivalent of manually pumping the brakes and is capable of cycling up to seven times per second.

> The rider will recognize ABS activation by the slight pulsing sensation in the hand lever or the rear brake pedal. The pulsing sensation may also be accompanied by a clicking sound from the ABS module. Both are the result of normal operation.

16. On February 17, 2014, Harris purchased the V-Rod new from a Harley-Davidson dealership in Olathe, Kansas.

17. At the time of the February 17, 2014 sale, the V-Rod was documented as having five (5) miles on the speedometer.

18. Harris was provided with an owner's manual for the V-Rod on February 17, 2014, after the sale was complete. Harris read through the entire owner's manual to learn about his new motorcycle before it was delivered to him.

19. Approximately 2-3 days after the sale, the V-Rod was delivered via tractor-trailer to Harris.

20. After Harris received the V-Rod, he rode the motorcycle to an open parking lot close to where he and his wife lived and spent time operating it away from any traffic in order to become familiar with the motorcycle's functions and feel. Among other things, Harris performed maneuvers with the motorcycle that are taught by the Motorcycle Safety Foundation in its Basic Rider Course, which he took in January 2014.

21. As Harris operated the V-Rod in the vacant parking lot, he noticed that the motorcycle's ABS light was flashing continuously.

22. Harris was concerned that this meant the ABS was not functioning. However, during this practice ride he applied the brakes over an area of gravel on the parking lot surface and the ABS activated. He knew that the ABS activated at that time because he felt the "slight pulsation" described in the owner's manual and neither of the motorcycle's wheels locked up. Since the ABS activated at this time, Harris believed that the ABS was properly functioning.

4

23. In late March and/or early April 2014, Harris rode his V-Rod from Junction City, Kansas to visit his family in Texas. Throughout the ride to Texas, the motorcycle's ABS light flashed continuously. Toward the end of his return trip to Kansas, the ABS light began illuminating more sporadically and in different ways. Sometimes it flashed continuously, while other times it remained illuminated or went completely off for short periods of time.

24. On April 14, 2014, Harris took the V-Rod in to City Cycle's service department and requested service on the ABS – due to the ABS light issues described herein – and also to have the Harley-Davidson 1000 mile scheduled maintenance performed.

25. When Mr. Harris took the motorcycle in to City Cycle, he asked the service technician to perform the 1000 mile "Authorized Service." He also asked City Cycle specifically to inspect the ABS light issue and, in doing so, he expressed his concerns and described in detail the ABS light's behavior since he got the motorcycle two months earlier.

26. City Cycle agreed to perform the requested services and took possession of the V-Rod. City Cycle documented in its repair order: "ABS light was on."

27. On April 15, 2014, a City Cycle representative called Harris and told him that the requested servicing of his motorcycle was done and it was ready for him to pick up.

28. When Harris arrived at City Cycle to get his motorcycle and pay for the servicing, the City Cycle service manager and technician, Dean Mize, told him that the 1000 mile service was performed and "everything looks good."

29. With respect to the ABS issue Harris specifically requested service on, Mize told Harris that no recalls were due and that the motorcycle did not have any Diagnostic Trouble Codes (DTC) to check.

30. City Cycle represented to Harris that there was no problem with the ABS and the V-Rod was "safe to ride."

31. City Cycle's representations to Harris concerning the work that City Cycle performed on the V-Rod, as well as the motorcycle's condition following service, were false.

32. City Cycle made these representations to Harris with the intention of causing Harris to rely on them.

33. City Cycle made these representations knowingly or with reason to know that, among other things: (1) City Cycle did not perform reasonable and adequate diagnostic procedures, troubleshooting methods, and services on the V-Rod, including but not limited to those necessary to appropriately address the underlying problem in the ABS and/or related components that were causing the ABS light issues; (2) the V-Rod's ABS was not functioning properly; and (3) there were DTC fault codes stored in the V-Rod's ABS module at the time that were prompted by an underlying problem present in the ABS and/or related components.

34. Harris relied on City Cycle's representations concerning the procedures and services that it performed on the V-Rod's ABS, as well as the motorcycle's "safe" condition.

35. Following City Cycle's servicing of the V-Rod, the motorcycle's ABS light continued exhibiting the same sporadic behavior as when Harris presented it for service.

36. The ABS light issues that Harris specifically requested service on, and were present both before and after City Cycle's servicing of the V-Rod, were caused by an underlying problem in the V-Rod's ABS and/or related components that City Cycle could have and should have diagnosed and repaired.

37. In reliance on City Cycle's representations, Harris continued operating the V-Rod based on his belief that it was "safe to ride" and the ABS was functioning properly.

38. Contrary to City Cycle's representations, the V-Rod's ABS was not functioning properly, and Harris suffered injuries and damages as a direct and proximate result of City Cycle's false representations and negligent service when the underlying problem present in the V-Rod's ABS and/or related components caused or contributed to cause the crash at issue in this lawsuit.

### Allegations Relating to the Accident and Plaintiff's Damages

39. At all relevant times, Harris met all the requirements for riding a motorcycle in the Army and on the roads of Kansas or any other state because he had a valid Texas motorcycle license and completed the Motorcycle Safety Foundation's Basic Rider Course.

40. On May 20, 2014, approximately three months after he purchased the V-Rod and one month after City Cycle's "Authorized Service," Harris was operating the Subject Motorcycle going eastbound on Williston Point Road in Fort Riley, Kansas.

41. Harris was wearing a helmet and full protective gear.

42. As Harris approached the intersection of Williston Point and 1st Division Road, he was traveling approximately 25 mph when the traffic signal in his direction turned yellow.

43. Harris began properly applying the motorcycle's brakes in order to stop at the intersection. Shortly after he began applying the brakes, the ABS warning light became illuminated on the V-Rod's instrument panel and he heard a "loud screech."

44. The V-Rod's ABS malfunctioned and caused or contributed to cause one or both of the wheels to "lock up," resulting in the "loud screech" that Harris heard. As a direct and proximate result, the motorcycle crashed down on its left side and slid along the pavement with Harris's left leg pinned between the pavement and the 650 pound motorcycle.

45. As a direct and proximate result of the crash, which City Cycle's negligent acts and/or omissions caused or contributed to cause, Harris sustained injuries and damages in an amount to be proven at trial.

46. Harris suffered permanent and severe injuries to his left knee, ankle, and foot as a result of the crash. Those injuries required him to participate in significant physical therapy and, ultimately, required him to undergo reconstructive surgery on his left ankle. Following the reconstructive surgery on his left ankle, Harris suffered various complications including but not limited to left peroneal and tibial neuropathy.

47. Harris's injuries did not heal, rather they progressed despite surgery and ongoing physical therapy, and therefore prevented him from performing his Army duties.

48. In December 2015, the Army's Physical Evaluation Board determined that Harris was unfit to continue military service based on its determination that the injuries he sustained as a result of the May 20, 2014 motorcycle crash were "unfitting" conditions.

49. Harris was medically discharged from the Army as a direct result of his injuries from the crash, which have caused and will in the future cause him to sustain substantial economic loss.

50. In sum, City Cycle's negligent acts and/or omissions caused or contributed to cause Harris injuries and damages, including but not limited to the following:

   a. He has sustained and will in the future sustain severe, permanent, and disabling injuries;

   b. He has sustained and will in the future sustain physical pain, suffering, disability, disfigurement and accompanying mental and emotional anguish;

8

    c. He has sustained and will in the future sustain the loss of the capacity for the enjoyment of life;

    d. He has incurred substantial medical expenses and will in the future incur expenses for medical care and treatment;

    e. He has lost and will in the future lose substantial earnings, income, and benefits, as well as the capacity to earn income; and

    f. He has sustained and will in the future sustain loss and/or impairment of his ability to perform services in the household and the discharge of his domestic duties, as well as loss and/or impairment of his companionship, aid, assistance, comfort, and society.

51. Shortly after the crash on May 20, 2014, the V-Rod was transported to Historic Harley-Davidson ("Historic HD"), an Authorized Harley-Davidson Dealer in Topeka, Kansas, for servicing and repair.

52. Between the time of the May 20, 2014 crash and delivery of the V-Rod to Historic HD, the V-Rod was stored and not operated, such that it was delivered without any material change in its post-crash condition.

53. On or about June 7, 2014, Historic HD provided Harris with a "Work Order Estimate" that detailed the damage to the V-Rod that was caused by the ABS malfunction and resulting crash, which totaled $5,684.30. This amount did not include Historic HD's servicing, diagnostics, and repairs related to the V-Rod's ABS light issues that existed at the time City Cycle serviced the motorcycle and remained present following the crash.

54. On or about July 16, 2014, Historic HD provided Harris with a "Work Order Estimate" that contained details regarding its performance of diagnostics, servicing, and repair of

9

the V-Rod's ABS for a total of $775.22.  Historic HD's invoice – Work Order #170656 – contains the following "Work Order Notes":

> H-D TECH REF #2284839
>
> C1027 REAR WHEEL SPEED INTERMITANT [sic]
>
> C1034 REAR WHEEL SPEED CIRCUIT OPEN/SHORTED
>
> C1208 REAR WHEEL SPEED SENSOR FREQUENCY OUT OF RANGE.
>
> AFTER DIAGNOSING AND FOLLING [sic] FLOW CHARTS TO THE ABS MODULE.  CALLED H-D TECH AND ORDERED ABS MODULE.
>
> INSTALLED ABS MODULE AND HAD ONE MORE ABS CODE.  CALLED H-D TECH ONE MORE TIME AND SUGGESTED TO CHECK FOR PINCHED WIRE IN THE HARNESS.  FOUND AND REPAIRED WIRE.
>
> NO TROUBLE CODES EXISTED AFTER THAT.

55. Through performing appropriate service and diagnostics on the V-Rod, Historic HD discovered and repaired the underlying problem in the V-Rod's ABS and/or related components that: (1) was causing the ABS light's sporadic behavior; (2) was present at the time the V-Rod was in City Cycle's possession on April 14-15, 2014; and (3) caused or contributed to cause the crash on May 20, 2014.

56. The underlying problem in the V-Rod's ABS and/or related components that was causing the ABS light issues was present on April 14, 2014, when Harris brought the motorcycle to City Cycle for "Authorized Service," including performance of the procedures included in Harley-Davidson's 1000 mile scheduled maintenance and, as expressly requested by Mr. Harris, diagnosis of the problem causing the Subject Motorcycle's ABS light issues.

57. City Cycle failed to reasonably and appropriately perform all service procedures and troubleshooting methods required by Harley-Davidson.

58. City Cycle failed to follow and appropriately perform the Harley-Davidson "Authorized Service," including but not limited to a "thorough performance and safety inspection."

59. City Cycle failed to consult Harley-Davidson's service manuals and call the Harley-Davidson Technical Support Line ("HD Tech") to diagnose Harris's intermittent electrical problem complaint.

60. These failures were negligent.

61. If City Cycle had appropriately and reasonably performed all the procedures required by Harley-Davidson, then the underlying problem present in the V-Rod's ABS and/or related components could have and would have been diagnosed and remedied.

62. City Cycle failed to reasonably and appropriately perform diagnostics, servicing, and repair of the V-Rod's ABS and/or related components, in light of Harris's explicit request that service technicians look into the ABS light issue described herein. City Cycle's acts and/or omissions in that respect were negligent.

63. City Cycle's negligent acts and/or omissions resulted in its failure to diagnose and remedy the underlying problem present in the V-Rod's ABS and/or related components, which could have and would have been found and fixed if City Cycle had performed reasonable and appropriate procedures and methods to determine the cause of the ABS light issue that Harris specifically notified them about and asked that they look into.

64. The underlying problem in the V-Rod's ABS and/or related components, which was present at the time the motorcycle was serviced by City Cycle, prompted the ABS "fault codes" that Historic HD noted in its July 16, 2014 service invoice.

65. City Cycle could have and would have discovered this underlying problem in the V-Rod's ABS and/or related components on April 14-15, 2014 – when the V-Rod was in City Cycle's possession for servicing – if its service technicians had performed reasonable and appropriate diagnostic procedures within the applicable standard of care.

66. After Historic HD performed repairs of the damage to the V-Rod caused by the May 20, 2014 crash, as well as the necessary diagnostics, servicing, and repair of the problem in the V-Rod's ABS and/or related components that was causing the ABS light issues, the V-Rod was provided back to Harris in July 2014 and has remained in his possession since that time.

67. Since the time that Historic HD performed diagnostics, servicing, and repair related to the V-Rod's ABS and/or related components, there have not been any issues with the motorcycle's ABS light and, to the best of Plaintiff's knowledge, the ABS has functioned properly.

## COUNT I – NEGLIGENCE

68. Harris incorporates by reference Paragraphs 1 through 67 as though fully set forth herein.

69. As an Authorized Harley-Davidson Dealer, City Cycle was required by Harley-Davidson to employ service technicians that "are specially trained and use advanced technologies to properly diagnose and maintain" Harley-Davidson motorcycles.

70. As an Authorized Harley-Davidson Dealer, City Cycle was required to develop, maintain, and operate an effective service organization, including competent service personnel in adequate numbers, essential equipment and tools, and service literature so as to provide prompt, professional, workmanlike, courteous, and willing service to all customers requesting Harley-Davidson Motorcycle service.

71. As an Authorized Harley-Davidson Dealer, City Cycle was required to perform all motorcycle service in accordance with such standards and procedures as specified or recommended by Harley-Davidson, including but not limited to those set forth in the Harley-Davidson Dealership Service Operations Manual.

72. City Cycle owed Harris a duty to comply with its own policies and procedures – as set forth in the Harley-Davidson Service Operations Manual – in performing the services that Harris requested, including but not limited to investigating his concern about the V-Rod's ABS light issues.

73. City Cycle had a duty to use reasonable care, through its employees and/or agents, in performing the services that Harris requested for the V-Rod.

74. City Cycle breached the duties of care it owed to Harris by, among other things:

   a. Failing to carefully listen to Harris's concerns about the V-Rod's ABS light and ask Harris questions to isolate the symptom;

   b. Failing to road test the V-Rod;

   c. Failing to consult Harley-Davidson service manuals;

   d. Failing to review and perform all necessary diagnostic and troubleshooting procedures set forth in the Harley-Davidson service manuals;

   e. Failing to road test the motorcycle while Harris rode alongside on another motorcycle so that he could demonstrate his concern about the ABS light;

   f. Failing to call HD Tech for help with diagnostics and troubleshooting;

   g. Failing to diagnose and remedy the underlying problem with the V-Rod's ABS or related components;

    h.   Representing to Harris that the V-Rod's ABS was functioning properly and that it was "safe to ride";

    i.   Failing to follow-up with Harris after the service event to determine whether his concern about the ABS persisted; and

    j.   Violating Harley-Davidson's standards for service operations, including those set forth in the Harley-Davidson Dealership Service Operations Manual, which City Cycle adopted as its service department policies and procedures.

75.    City Cycle's negligent acts and/or omissions, as described herein, caused or contributed to cause the V-Rod's ABS to malfunction, such that it failed to prevent and/or caused one or both of the motorcycle's wheels to lock up, which in turn caused the motorcycle to go out of control and crash.

76.    City Cycle's negligent acts and/or omissions, as described herein, caused or contributed to cause injuries and damages to Harris, as set forth herein.

WHEREFORE, Harris prays for judgment against City Cycle on Count I for a fair and reasonable sum of damages in an amount exceeding $75,000, for his costs herein, interest, and for such other and further relief the Court deems just and proper.

### COUNT II – KANSAS CONSUMER PROTECTION ACT VIOLATIONS

77.    Harris incorporates by reference Paragraphs 1 through 76 as through fully set forth herein.

78.    Harris is a "consumer" as defined in the Kansas Consumer Protection Act, K.S.A. § 50-624(b).

79.    City Cycle is a "supplier" as defined in the Kansas Consumer Protection Act, K.S.A. § 50-624(l).

80. City Cycle's sale of services to Harris with respect to the V-Rod was a "consumer transaction" as defined in the Kansas Consumer Protection Act, K.S.A. § 50-624(c).

81. In connection with City Cycle's sale of services to Harris with respect to the V-Rod, City Cycle expressly and impliedly represented to Harris that: (1) its service technicians reasonably and appropriately performed all of the service procedures and methods as required by Harley-Davidson; (2) its service technicians reasonably and appropriately performed all the service procedures and methods included in the Harley-Davidson 1000 mile scheduled "Authorized Service"; (3) its service technicians reasonably and appropriately performed all service procedures and methods set forth in the Harley-Davidson manuals; (4) its service technicians "checked out" the ABS light issues described herein, as specifically requested by Harris, and found that there were no outstanding recalls and the V-Rod "had no DTC to check"; (5) the V-Rod's ABS was properly functioning; and (6) the V-Rod was "safe to ride."

82. City Cycle engaged in deceptive acts and/or practices in violation of the Kansas Consumer Protection Act, K.S.A. § 50-626(b)(1), in that City Cycle made these express and implied representations to Harris knowingly or with reason to know that: (1) its service technicians did not follow and perform all the service procedures and methods required by Harley-Davidson; (2) its service technicians did not perform all of the stated procedures included in Harley-Davidson's 1000 mile scheduled maintenance, including but not limited to a "road test" to "verify component and safety functions"; (2) its service technicians did not consult the Harley-Davidson manuals for follow the procedures and methods set forth therein, including but not limited to calling HD Tech; (3) its service technicians did not appropriately perform reasonable and necessary diagnostic procedures to determine what was causing the V-Rod's ABS light issues described by Harris and whether the ABS was properly functioning, including but not limited to

15

checking the ABS module for current and historic DTCs using the Harley-Davidson "Digital Technician II" tool; (4) the V-Rod's ABS module contained historic and/or current DTC, including but not limited to the DTC documented by Historic HD after the subject crash, that were triggered by an underlying problem in the ABS and/or related components that was also causing the ABS light issues; (5) the V-Rod's ABS and/or related components contained an underlying problem that was causing the ABS light's sporadic behavior, including but not limited to a "pinched wire" in the wire harness; (6) that intermittent electrical problems, like the ABS issues Harris complained of, is a serious safety hazard dangerous to Harris; and (7) the V-Rod was not "safe to ride."

83. City Cycle made representations to Harris, either knowingly or with reason to know, that its services on the V-Rod:

    a. Had characteristics and benefits that they did not have; and

    b. Were of a particular standard and quality, when they were of another that differed materially from the representation.

84. In connection with City Cycle's sale of services to Harris with respect to the V-Rod, City Cycle also engaged in deceptive acts and/or practices in violation of the Kansas Consumer Protection Act, K.S.A. § 50-626(b)(2), in that City Cycle willfully used, in oral and/or written representations to Harris, exaggeration, falsehood, and/or ambiguity as to a material fact, namely that:

    a. Its service technicians reasonably and appropriately performed and completed all procedures and methods required by Harley-Davidson, when in fact they had not;

    b. Its service technicians performed and completed all of the procedures and methods included in Harley-Davidson's 1000 mile "Authorized Service," when in fact they had not;

    c. Its service technicians performed and completed all of the procedures and methods included in the Harley-Davidson manuals, when in fact they had not;

    d. Its service technicians appropriately performed diagnostic services to determine the cause of the ABS light issues that Harris described and specifically sought service on when he brought the V-Rod to City Cycle for service, when in fact they had not;

    e. The V-Rod "had no DTC to check," even though City Cycle's service technicians either had not performed the check at all or, alternatively, had checked the ABS module and found existing current and historic DTC that they failed to appropriately address or disclose to Harris;

    f. The V-Rod's ABS was properly functioning, when in fact it was not; and

    g. That the V-Rod was "safe to ride," when in fact it was not.

85. In the alternative, City Cycle engaged in deceptive acts and/or practices in violation of the Kansas Consumer Protection Act, K.S.A. § 50-626(b)(3), in that City Cycle willfully failed to state a material fact, and/or willfully concealed, suppressed, or omitted a material fact, when it sold its services on the V-Rod to Harris, namely that:

    a. Its service technicians did not reasonably and appropriately perform all procedures and methods required by Harley-Davidson;

    b. Its service technicians did not perform and complete all of the procedures and methods included in Harley-Davidson's 1000 mile "Authorized Service";

    c. Its service technicians did not perform and complete all of the procedures and methods included in the Harley-Davidson manuals;

    d. Its service technicians failed to appropriately perform diagnostic procedures to determine the cause of the ABS light issues that Harris described and specifically sought service on when he brought his motorcycle in for service;

    e. The V-Rod's ABS module contained current and historic DTC that were triggered as a result of the system detecting an underlying problem in the ABS and/or related components;

    f. The V-Rod's ABS and/or related components contained an underlying problem that could and would cause the ABS to malfunction, such that it would cause and/or fail to prevent one or both of the motorcycle's wheels from locking up;

    g. Intermittent electrical problems pose a significant safety hazard; and

    h. The V-Rod was not "safe to ride."

86. In connection with City Cycle's sale of services to Harris with respect to the V-Rod, City Cycle engaged in unconscionable acts or practices in violation of the Kansas Consumer Protection Act, K.S.A. § 50-627 – when considering what it knew or had reason to know – because, among other things and at a minimum, City Cycle: (1) took advantage of the inability of Harris to reasonably protect his interests because of his ignorance as to the technical and safety issues presented by the ABS light problems that he requested City Cycle check for him; (2) Harris was unable to receive a material benefit from the services purportedly performed to service the cause of the ABS light issues; and (3) City Cycle made misleading statements of opinion on which Harris was likely to rely to his detriment, including but not limited to that the V-Rod was "safe to ride."

87. As a direct and proximate result of City Cycle's violations of the Kansas Consumer Protection Act, Harris was damaged and seeks all damages allowed pursuant to K.S.A. § 50-634(b), including attorneys' fees.

WHEREFORE, Harris prays for judgment against City Cycle on Count II for a fair and reasonable sum of damages, for his costs herein, for attorneys' fees, interest, and for such other and further relief as the Court deems just and proper.

**JURY TRIAL DEMANDED**

Respectfully submitted,

ROUSE FRETS WHITE GOSS GENTILE RHODES, P.C.

*/s/ Jeffrey D. Rowe*

| | |
|---|---|
| Jeffrey D. Rowe | KS #23083 |
| R. Douglas Gentile | KS #13907 |
| Rachel N. Boden | KS #26238 |
| Daniel A. Kopp | KS# 28354 |

5250 West 116th Place, Suite 400
Leawood, KS 66211
(913) 387-1600
(913) 928-6739 - fax
jrowe@rousepc.com
dgentile@rousepc.com
rboden@rousepc.com
dkopp@rousepc.com

and

Thomas J. Dickerson            KS #24647
DICKERSON OXTON LAW FIRM
1200 Main St., Suite 2120
Kansas City, MO 64105
(816) 368-5637
(816) 268-1965 - fax
tdickerson@dickersonoxton.com

***ATTORNEYS FOR PLAINTIFF***